UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60025-CIV-ZLOCH

ROBERT WOODS, BRYAN PEPITONE,
and ROBIN OWENS,

   Plaintiffs,

vs.            **O R D E R**

CITY OF PLANTATION, a Florida
Municipal corporation, and
PAUL SWANEY, individually,

   Defendants.
_____/

   THIS MATTER is before the Court upon Defendant Paul Swaney's Motion For Summary Judgment (DE 37) and Defendant City of Plantation's Motion For Summary Judgment (DE 39).  The Court has carefully reviewed said Motions and the entire court file and is otherwise fully advised in the premises.

   This action is brought under the Civil Rights Act, 42 U.S.C. § 1983 (2006), by Plaintiffs Robert Woods, Robin Owens, and Bryan Pepitone, who allege that Defendant Paul Swaney violated their rights under the Fourth Amendment when he arrested them without probable cause and in an effort to effect their arrests employed unreasonable force.  Plaintiffs have also named the City of Plantation as a Party to this action.  DE 9.  In the instant Motions (DE Nos. 37 & 39) Defendants make two arguments in support of the Court granting summary judgment: first, Officer Swaney had probable cause to arrest the Plaintiffs and the force he employed in effecting their arrests was reasonable; in the alternative,

Defendants argue that they are protected from suit on the basis of qualified immunity.   For the purposes of a qualified-immunity analysis, the Court must resolve all factual disputes in favor of Plaintiffs and then determine the legal question of whether Defendants are entitled to qualified immunity under that version of the facts.   <u>Durruthy v. Pastor</u>, 351 F.3d 1080, 1084 (11th Cir. 2003).

## I. <u>Background</u>

The events that give rise to this action began at the home of Plaintiff Bryan Pepitone's mother Joyce Pepitone.   Bryan Pepitone (hereinafter "Pepitone") came to his mother's house with his brother Brett Pepitone and a friend to pick up his younger sister and take her to watch a boxing match.   When Pepitone entered the house, his mother was playing pool with a date, Paul Nolan (hereinafter "Nolan").   The Parties dispute the substance and form of the interchange that took place between Pepitone, his mother, and Nolan.   Taking as true Pepitone's innocuous account of the exchange, it was sufficiently alarming and threatening to prompt Joyce Pepitone to call 911 for police assistance.

After receiving Joyce Pepitone's phone call, the 911 dispatcher gave Plantation Police Officer Paul Swaney (hereinafter "Swaney") the signal that a "domestic disturbance" was taking place at Joyce Pepitone's home.   By the time Swaney arrived, Pepitone had already driven back to his home.   Joyce Pepitone and Nolan gave Swaney a statement to the effect that Nolan was threatened by

2

Pepitone.   Deposition of Paul Nolan, DE 46, Ex. 7, p. 7 (hereinafter "Nolan Dep."); Statement of Paul Nolan, DE 46, Ex. 8, P. 2.  This included Pepitone holding a cue ball to Nolan's face accompanied by threatening language.  Nolan Dep. pp. 5-6, 10. Joyce Pepitone gave Swaney her son's address and asked that Swaney explain to him that his behavior was inappropriate.  Deposition of Joyce Pepitone, DE 46, Ex. 5, pp. 34-37 (hereinafter "Joyce Pepitone Dep.").   Notwithstanding Joyce Pepitone's desire for Swaney only to speak with Pepitone and not to arrest him, Swaney was of the opinion that Pepitone had committed aggravated assault against Nolan.

Swaney drove to Pepitone's residence to further investigate the incident.  Plaintiff Robin Owens, Pepitone's girlfriend and the mother of his children, answered the door and summoned Pepitone to speak with Swaney.  Pepitone walked outside to speak with Swaney. Swaney asked Pepitone about the events at Joyce Pepitone's house earlier that night and whether he was home all night.  Pepitone responded that he had been home most of the night.  Deposition of Bryan Pepitone, DE 46, Ex. 2, pp. 61-62 (hereinafter "Pepitone Dep.").  Swaney then went and felt the hood of one of the vehicles parked in Pepitone's driveway and asked why the hood was warm if he had been home all night.  Id. at 62.  Pepitone responded, "I told you I was here most of the night and I am not the maker of Chevy so I don't know how hot the hood would be if the car was driven."  Id. at 63.  Swaney then directed Pepitone to walk to his police car.

Pepitone obeyed the command, and as he walked towards the vehicle Swaney shoved him in the back.  Pepitone turned to ask why he was pushed, and Swaney shoved him a second time.  Id. at 65.  At this point Swaney's flashlight fell to the ground and Swaney told Pepitone not to resist him further.  Id. at 68.  Swaney then took a hold of Pepitone's arm with one hand and placed the other on his belt buckle and drove him into the car.  Id.; see also Deposition of Robin Owens, DE 46, Ex. 1, p. 38 (hereinafter "Owens Dep.").  At this point he placed Pepitone's arm in a so-called "chicken wing" hold, and pinned him against the police car.  Id. at 69.  Swaney did not handcuff Pepitone at this point; instead, he again instructed Pepitone not to resist arrest.  Pepitone responded that he was not resisting and that "he could not even if he wanted to do so."  Id. at 69-70.  Swaney told Pepitone not to reach for his gun. Id. at 70.  Pepitone then informed Swaney that he was not trying to go for his gun, and that he knew that Swaney was saying those things so it would look like they were in a tussle.  Id. at 73.  At some point in this exchange, Swaney radioed for backup.

While Pepitone was against the car, Swaney tried to take Pepitone from the car and position him on the ground.  Pepitone described this as an attempted body slam.  Id. at 73-74.  To defend himself from the potential harm he would be subjected to if he were forced to the ground, Pepitone caught himself each of the three times Swaney tried to take him to the ground.  Id.  After several unsuccessful attempts to bring Pepitone to the ground, a second

4

Plantation Police Officer, Kesslan, arrived on the scene and tackled both Swaney and Pepitone to the ground.[1]

Both Kesslan and Swaney proceeded to punch and knee Pepitone for approximately twenty seconds. Id. at 77-78. At this point, many of the guests at Pepitone's house, including Plaintiffs Robin Owens (hereinafter "Owens") and Robert Woods (hereinafter "Woods"), came out of the house and began yelling at the officers to stop. Owens stood at a distance of twenty-five to thirty feet from the officers and began screaming at them to stop hurting Pepitone and to tell her what was happening. Owens Dep. p. 46. With rather forceful and colorful language, Swaney ordered her to stop speaking and get back. Id. at 48. Owens then took a step back and continued to scream at the officers. Id.; see also Pepitone Dep. pp. 78-79. Swaney then disengaged from Pepitone and charged at Owens. He grabbed her and then threw her against a parked vehicle. Owens Dep. pp. 49-51.

As Swaney disengaged to charge at Owens, Pepitone turned his head to look at Owens and maneuvered his hands underneath himself into a pushup position. Pepitone Dep. pp. 79-80. He also began to plead with the officers that they leave her alone and not hurt her as he was trying to crawl toward Owens. Id. at 80. After observing Pepitone attempting to crawl to Owens, Swaney broke his

---

[1] Neither the Parties' briefs, nor the Depositions provide a first name for the second officer, he is referred to only as Officer Kesslan.

hold on Owens and returned his attention to Pepitone, kicking him in the ribs.  Id. at 81.  The other guests at the party began yelling and swearing at the officers.  While it is not clear what distance these guests were from the officers, taking the facts in the light most favorable to the Plaintiffs they were 25-30 feet from where Pepitone was being arrested.  At this point, other backup officers arrived.  One officer brought a police dog and placed it in front of Pepitone's face.  Id. at 82-83.  The officers then began to taunt Pepitone with colorful and graphic language to the effect that he should try and escape.  Pepitone was immediately handcuffed and placed in the back of a police car.  Id.

Once Pepitone was secured, Swaney went into the house and arrested Owens.  Owens Dep. 58-59.  In the process of effecting the arrest, he grabbed her by the blouse and dragged her out of the house.  Id. at 59.  Owens was charged with obstruction of justice. As Owens was arrested, Woods verbalized for the officers, with colorful and rather graphic language, his discontent with Swaney and the way he handled the arrest of Pepitone and Owens. Deposition of Robert Woods, DE 46, Ex. 3, pp. 65-66 (hereinafter "Woods Dep.").  Woods does not recall whether he was closer to Officer Swaney than the others.  Id.  However, Swaney testified at his deposition that Woods was verbalizing his discontent in the immediate vicinity of Swaney and Owens while the latter was being arrested inside the house.  Deposition of Paul Swaney, DE 46, Ex. 4, pp. 40-42  (hereinafter "Swaney Dep.").  Swaney told Woods to

get back as he finished handcuffing Owens. <u>Id.</u> p. 41. Soon
thereafter, another officer approached Woods and informed him that
he was in danger and told him that it would be best if he came out
of the house. Woods Dep. pp. 66-67. Woods followed the officer to
the street, where Swaney began taunting him and subsequently
arrested him for obstruction of justice. <u>Id.</u> Robin Owens was
released a few hours after her arrest, and Robert Woods was
released the next day. Bryan Pepitone was released the following
Monday, and he complained of bruised ribs from the force used
against him during his arrest. He reported no other injuries.
Pepitone Dep. pp. 92-93.

## II. <u>Standard of Review</u>

Qualified immunity offers "complete protection for government
officials sued in their individual capacities as long as their
conduct violates no clearly established statutory or constitutional
rights of which a reasonable person would have known." <u>Thomas v.</u>
<u>Roberts</u>, 261 F.3d 1160, 1170 (11th Cir. 2001) (quotation omitted).
Qualified Immunity protects all but the plainly incompetent, or
those who knowingly violate federal law from suit, and it allows
government officials to carry out their duties without the fear of
personal liability or harassing litigation. <u>Anderson v. Creighton</u>,
483 U.S. 635, 638 (1987); <u>Willingham v. Loughnan</u>, 261 F.3d 1178,
1187 (11th Cir. 2001). Qualified immunity is "an entitlement not
to stand trial or face the other burdens of litigation." <u>Mitchell</u>
<u>v. Forsyth</u>, 472 U.S. 511, 526 (1985). "The privilege is an

7

immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quotation omitted). The question of whether a defendant is entitled to qualified immunity is a question of law. It turns on whether the law at the time of the incident in question was clearly established so that a reasonable person should have known that he was violating it. See Courson v. McMillian, 939 F.2d 1479, 1487-88 (11th Cir. 1991).

The Court's analysis when addressing the issue of qualified immunity is threefold. The initial inquiry is whether the government official was acting within the scope of his discretionary authority at the time the allegedly wrongful acts occurred. See Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that officer Swaney was exercising his discretionary authority as a police officer at the time he arrested Plaintiffs. Once it is established that a defendant was acting within his discretionary authority, the Court applies the two-part test articulated by the Supreme Court in Saucier v. Katz: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"; and (2) If a constitutional right was violated under the plaintiffs' version of the facts, the Court must then determine "whether the right was clearly established." Saucier, 533 U.S. at 201. As noted in Durruthy v. Pastor, the

Saucier analysis "must be undertaken in light of the specific context of the case, and not as a broad general proposition." Id. (quotation omitted).   In Saucier, the Supreme Court noted that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.   However, if a constitutional right would have been violated under the plaintiff's version of the facts, the Court must then determine whether the right was clearly established. See id.

### III.   Analysis

Plaintiffs argue that Swaney violated their clearly established Fourth Amendment rights by arresting them without probable cause and that he used excessive force to effectuate the same.   The Court will conduct a separate analysis for each Plaintiff and his or her separate claims.   Each of the Plaintiffs claim that his or her arrest was unlawful.   Plainly, an arrest without probable cause violates the right to be free from an unreasonable seizure under the Fourth Amendment. See Durruthy, 351 F.3d at 1084 ("[A]n arrest made without probable cause violates the Fourth Amendment.") (quoting Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998)).   Probable cause to arrest a suspect exists "when an arrest is objectively reasonable based on the totality of the circumstances." McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quotations omitted).   In Durruthy, the Eleventh Circuit noted that "[t]his

standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." <u>Durruthy</u>, 351 F.3d at 1088 (quotation omitted). Thus, "[a]lthough probable cause requires more than suspicion, it does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction." <u>Id.</u> (quoting <u>Ferraro</u>, 284 F.3d at 1195).

Most probable cause determinations are made <u>ex parte</u>, under pressure, and based on the evidence that is apparent to the officer at that moment. <u>Id.</u>; <u>see</u> <u>United States v. Gonzalez</u>, 969 F.2d 999, 1003 n.6 (11th Cir. 1992) ("[T]he court must decide whether the objective facts available to the officers <u>at the time of arrest</u> were sufficient."). Officers who make an arrest without probable cause are still "'entitled to qualified immunity if there was arguable probable cause for the arrest.'" <u>Durruthy</u>, 351 F.3d at 1089 (quoting <u>Jones v. Cannon</u>, 174 F.3d 1271, 1283 (11th Cir. 1999). Thus, arguable probable cause exists when "an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed" at the time of the arrest. <u>Montoute v. Carr</u>, 114 F.3d 181, 184 (11th Cir. 1997). The Eleventh Circuit has framed the concept as this:

Arguable probable cause exists where reasonable officers

in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest. In determining whether arguable probable cause exists, [courts] apply an objective standard, asking whether the officer's actions are objectively reasonable regardless of the officer's underlying intent or motivation. Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors.

Ferraro, 284 F.3d at 1195. Thus, even if it appears to the Court on the cold record of the case that an officer lacked probable cause to make an arrest, he will be protected by Qualified Immunity so long as there was an arguable basis for belief that probable cause did exist.

A.

The facts establish that at the time Swaney arrested Pepitone, he received a report of a domestic disturbance and had the statements of Joyce Pepitone and Paul Nolan concerning the same. The fact that both have modified their stories between the time the underlying criminal action commenced and their deposition in the instant civil action is of no consequence to what Swaney knew and believed at the time he interviewed Joyce Pepitone and Nolan. Compare DE 46, Ex. 6 Joyce Pepitone Dep. (Mar. 28, 2001), with DE 46, Ex. 5 Deposition of Joyce Pepitone (9/17/2004). Swaney received sufficient, reliable allegations that Pepitone assaulted Nolan the night in question to support a finding of probable cause to arrest Pepitone. Thus, the Court finds that Swaney's arrest of

Pepitone did not violate Pepitone's rights under the Fourth Amendment to be free from seizure without probable cause. In the alternative, the Court finds that even if it were later determined that Swaney lacked probable cause to arrest Pepitone, Swaney possessed evidence sufficient to find that he had arguable probable cause that Pepitone committed a crime, so as to arrest him.

### B.

Taking Robin Owens's version of the events as true, at the time she was arrested by Swaney, she was outside her home within 25-30 feet of two officers attempting to effect an arrest on her boyfriend, Pepitone. As she stood at that distance, she was alternating between screaming at the officers to stop and inquiring as to why they were being so forceful with him. Swaney commanded Owens, to shut up and get back. Owens Dep. p. 48; Pepitone Dep. p. 78-79. She immediately complied with his order, took a step back and continued to inquire as to why they were treating Pepitone in that manner, and pleading that they stop hurting him. Owens Dep. p. 48. In Woods's Deposition, he describes Owens as being the closest person to the officers. Woods Dep. p. 60. Swaney maintains that during this time Owens was screaming at him and physically touched him while he was trying to arrest Pepitone. Swaney Dep. pp. 28-30, 62. Based on the posture of the instant Motions, the Court takes as true Plaintiffs' version of the events and gives no credence to Swaney's statement that Owens physically

touched him.  However, the Court does take note of the fact that
Swaney felt that Owens was interfering with his arrest of Pepitone
when he arrested her.

Under Florida Statutes § 843.02, it is a misdemeanor for
anyone to resist an officer without violence to the officer's
person.  The statute states in pertinent part that

> Whoever shall resist, obstruct, or oppose any officer .
> . . authorized to execute process in the execution of
> legal process or in the lawful execution of any legal
> duty, without offering or doing violence to the person of
> the officer, shall be guilty of a misdemeanor of the
> first degree.

Fla. St. § 843.02 (2007).  The statute is meant to apply when a
person willfully interferes with an officer's lawful activities,
and can include a person's inaction.  See J.M. v. State, 960 So. 2d
813, 815 (Fla. Dist. Ct. App. 2007) (holding that defendant's
presence in the park after orders to leave was sufficient to
support a conviction for violating § 843.02).  Florida cases
establish a varying standard for conduct that violates § 843.02.
See N.H. v. State, 890 So. 2d 514, 516-17 (Fla. Dist. Ct. App.
2005) (finding that a juvenile resisted an officer by refusing to
identify himself and allow officers to conduct an investigation);
H.A.P. v. State, 834 So. 2d 237, 239 (Fla. Dist. Ct. App. 2002)
(holding suspect resisted an officer without violence by refusing
to leave an area where the SWAT team was conducting a search);
K.A.C. v. State, 707 So. 2d 1175, 1177 (Fla. Dist. Ct. App. 1998)
(finding that a juvenile's refusal to identify himself and his

school upon request by an officer constitutes an inaction and resisting an officer without violence).

The standard of whether an officer has probable cause to believe that a violation of § 843.02 has taken place, or whether one has in fact taken place, lacks clearly defined bright lines. See Davis v. Williams, 451 F.3d 759, 765 (11th Cir. 2006). Certain caselaw suggests that physical conduct must accompany offensive words to support a conviction under § 843.02. Id.; State v. Dennis, 684 So. 2d 848, 849 (Fla. Dist. Ct. App. 1996) (holding police did not have probable cause to arrest defendant for obstruction when defendant was yelling street term "ninety-nine" which means police were in the area while undercover officers were attempting drug bust of drug dealer); D.G. v. State, 661 So. 2d 75, 76 (Fla. Dist. Ct. App. 1995) (finding juvenile's verbal protests and refusal to answer officer's questions, unaccompanied by physical opposition or threats, did not constitute obstruction). However, there is also caselaw to support the proposition that words alone may result in obstruction of justice where the officer in question is 1) effecting service of process; 2) legally detaining a person; or 3) asking for assistance. Williams, 451 F.3d at 765, n.9 (citing Francis v. State, 736 So. 2d 97, 99 (Fla. Dist. Ct. App. 1999)).

The fact that Owens was yelling and cursing at the officer while he was legally detaining Pepitone, taken with her presence

near the arrest, was sufficient for Swaney to believe that he had probable cause to arrest her for violating § 843.02. See Wilkerson v. State, 556 So. 2d 453, 456 (Fla. Dist. Ct. App. 1990) (holding that cursing and yelling at officers and refusing to leave the scene of a police search was sufficient to arrest defendant); Francis, 736 So. 2d at 99 (holding that defendant's actions of physically blocking the officer's path to investigate a beating in another room constituted obstruction under § 843.02). Further, the fact that Owens took a step back after Swaney instructed her to shut up and back away may constitute disobedience with an Officer's legal command: a single step back was not full compliance with Swaney's order. This is re-enforced by the fact that when Owens did take a step back, Owens continued to yell at the Officers. Owens Dep. 46-48.

While Owen's conduct may have been a natural human reaction to a tense situation where a loved one is being harmed, that does not insulate the behavior from constituting a violation of § 843.02. Taking the facts as alleged by Plaintiffs as true, there was sufficient evidence at the time Owens was arrested to support a finding of probable cause by Swaney that she violated § 843.02. Therefore, the Court does not find that her Fourth Amendment right to be free from seizure without probable cause was violated. If it were later determined that Owens's conduct did not rise to the level of probable cause to arrest under § 843.02, the Court finds

15

that there was sufficient evidence for Swaney to believe that he had arguable probable cause to arrest her for the same.

C.

Taking Plaintiffs' version of the facts as true, Robert Woods engaged in the same verbal berating of Swaney as the others at Pepitone's home.  Woods described his behavior as yelling and cursing at the officers.  Woods Dep. p. 66.  Woods was at a close distance to Swaney when he arrested Owens, although the record is unclear as to the exact distance.  It is clear that Woods was close to Owens when Swaney first grabbed and pushed her against the car and later when he arrested her by dragging her out of the house.  Id. at 59, ln 7-9 (noting that everyone, including Owens, was close together in front of the house).  Under Plaintiffs' version of the events, Woods never disobeyed a direct command, he simply continued to yell at the officers through the whole process.  As noted above, in many cases where courts draw the outer limits of § 843.02, they often maintain that a violation consists of verbal obstruction with another act, such as disobedience to an order or a physical hindrance to the officer, unless the officer is effecting an arrest.  See Williams, 451 F.3d at 765, n.9.  Thus, taking Plaintiffs' version of the facts as true, the Court finds that Swaney had probable cause to arrest Woods for his behavior during the arrest of Pepitone and Owens.

The evaluation of probable cause during a heated situation is

not a simple task, and reasonable minds may disagree.  Therefore, for the benefit of the Parties and any reviewing Court, the Court shall assume in the alternative that Woods's conduct did not rise to the level of probable cause and address the second step in the Saucier analysis.  Under Saucier, once a violation has been established the Court's analysis turns to whether the Defendant is entitled to qualified immunity.  The analysis then focuses on whether, at the time the violation occurred, "every objectively reasonable police officer would have realized the acts violated already clearly established federal law." Garrett v. Athens-Clarke Co., 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing Saucier, 533 U.S. at 201-02); see also Hope v. Pelzer, 536 U.S. 730, 736 (2002). As noted above, to determine whether the officers' conduct was "reasonable" under the circumstances, the Court uses an objective inquiry: the question is whether the officer's actions are objectively reasonable.  "It must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citations omitted).

In this action, under Plaintiffs' allegations, the officer was faced with an intense situation.  The arrest of Pepitone required three officers to effectuate.  There was a large crowd yelling a variety of profanities at Swaney and the other officers.  Owens would not obey the officers' commands and was taken from her home

17

and arrested in front of the crowd.  In addition, Woods himself was yelling profanities at the officers at close range.  This included profanities at the time Owens was being arrested.  As noted above, the law of Florida is not so clear that every objectively reasonable police officer in that situation would have concluded there was not probable cause to arrest Woods for violating § 843.02.  Therefore, the Court finds that Defendants are entitled to qualified immunity as to Plaintiff Robert Woods's allegation that Defendants violated his Fourth Amendment right to be free from seizure without probable cause.

IV. <u>Excessive Force</u>

The second facet of Plaintiffs' allegations is that Defendant Swaney used unreasonable force to effectuate their arrests in violation of the Fourth Amendment.  The right to be free from unreasonable searches and seizures also "encompasses the plain right to be free from the use of excessive force in the course of an arrest."  <u>Durruthy</u>, 351 F.3d at 1094 (quoting <u>Ferraro</u>, 284 F.3d at 1197).  The Court's analysis centers on whether the "officer's conduct is objectively reasonable in light of the facts confronting the officer."  <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir. 2002).

"When an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate

a full custodial arrest." <u>Ferraro</u>, 284 F.3d at 1196.  Florida law also provides that a full custodial arrest is permitted, even when the offense is a misdemeanor.  Fla. Stat. § 901.15(1) (2007) ("A law enforcement officer may arrest a person without a warrant when . . . [t]he person has committed a felony or misdemeanor . . . in the presence of an officer.").  In making such an arrest, Fourth Amendment jurisprudence recognizes officers' duty to make an arrest necessarily carries with it the right to use some degree of physical coercion.  <u>Ferraro</u>, 284 F.3d at 1197.  To determine whether the use of physical coercion in effectuating an arrest was "objectively reasonable," the Court considers such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Id.</u> at 1197-98 (quotation omitted); <u>see also</u> <u>Garrett</u>, 378 F.3d at 1280 (noting "defendants do not use excessive force if they act in an 'objectively reasonable' manner in the light of the facts and circumstances before them.") (citing <u>Graham</u>, 490 U.S. at 397).

It is well established that when a police officer makes a custodial arrest, some use of force is necessary and lawful, regardless of the severity of the alleged offense.  When an Officer uses so-called "<u>de</u> <u>minimis</u> force" the Court's find that the person's rights have not been violated.  <u>Durruthy</u>, 351 F.3d at

1094.  Simply put, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."  Id., citing Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000).  There are no precise limits of what can be considered de minimis and what is excessive force.  Caselaw has defined certain actions as de minimis, which may strike some as severe instances of physical coercion.  Cf. Durruthy, 351 F.3d at 1094 (noting the quantum of force used in that instance was less than what others have found as de minimis); see, e.g., Nolin, 207 F.3d at 1255 (finding force to be de minimis where an officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him"); Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (finding the force used to be minor where officers slammed the plaintiff against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket); Sullivan v. Pembroke Pines, 161 Fed. Appx. 906 (11th Cir. 2006).  It is only when the amount of force used by an officer passes over the threshold of de minimis and, under the circumstances, becomes an unreasonable use of force that the Court will find that a violation took place.  See, e.g., Carr v. Deeds, 453 F.3d 593, 605-06 (4th Cir. 2006) (noting a "plaintiff must also demonstrate that the

injuries were 'more than de minimis' or that the force used is of a sort repugnant to the conscience of mankind or the pain itself is such that it can properly be said to constitute more than de minimis injury") (quotation omitted).

The Court's analysis as to each Plaintiffs' excessive force claims is two-fold: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right;" (2) If a constitutional right was violated under the plaintiffs' version of the facts, the court must then determine "whether the right was clearly established." Saucier, 533 U.S. at 201.  The Court will address each Plaintiff's claim of unreasonable force separately.

A.

As noted above, while Swaney was arresting Pepitone he pushed him several times, slammed him against a vehicle, put his arm into a chicken-wing hold, and unsuccessfully attempted to slam him to the ground several times.  Pepitone was then tackled to the ground by Officer Kesslan.  When he was on the ground Pepitone was punched and kneed numerous times by both officers.  After Pepitone was partially restrained, but while he was capable of moving his arms and crawling, Swaney returned from dealing with Owens and kicked him in the ribs.  Soon thereafter, other officers arrived at the scene, a police dog was put in his face, he was taunted by the police, and immediately handcuffed and placed under arrest.  After

he was handcuffed, no further physical force was used against him.

Officers effecting an arrest are entitled to use reasonable physical force to effect the same.  <u>Ferraro</u>, 284 F.3d at 1197 (quotation omitted).  To determine whether the use of physical coercion was reasonable, courts consider, <u>inter alia</u>, whether a suspect "is actively resisting arrest or attempting to evade arrest by flight."  <u>Id.</u> at 1197-98 (quotation omitted).  The physical coercion used upon Pepitone can be broken into two parts:  before and after the second officer arrived.  As noted above, Swaney had probable cause to arrest Pepitone when he first pushed him and attempted to take him down to the ground to handcuff him.  Taking Pepitone's version of the facts as true, Swaney's actions before Officer Kesslan arrived strike the Court as gratuitous, but they do not rise above a <u>de minimis</u> use of force. <u>See Saucier</u>, 533 U.S. at 209 (noting that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment"); <u>Durruthy</u>, 351 F.3d at 1094 (noting that even if the force used "was unnecessary, plainly it was not unlawful").

As noted above, when Swaney had Pepitone in the chicken-wing hold, he attempted several times to bring Pepitone to the ground in an effort to handcuff him.  With each attempt Pepitone successfully thwarted Swaney's efforts, and informed Swaney that "I cannot let you do that."  Swaney Dep. p. 74.  At this point he was resisting arrest.  As Pepitone was resisting arrest, both he and Swaney were

tackled to the ground by Officer Kesslan. At this point the use of force by both officers becomes much more violent, including delivering punches and knees to Pepitone's body. While the line between Pepitone protecting his person and resisting arrest is a fine one, it is for a criminal jury to decide and the Court will not impose a burden upon police officers to determine whether a suspect's physical resistance to an arresting officer's use of force is aimed at self-preservation or at escape. See, e.g., Saucier, 533 U.S. at 205 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed."). Therefore, the Court views Swaney's use of force in light of Pepitone's active resistance to arrest seconds prior to being taken to the ground.

After Pepitone was tackled, Swaney exerted the force reasonably necessary to subdue Pepitone, including kneeing and punching him. This lasted a short time, perhaps twenty seconds. Pepitone Dep. p. 78. Once Swaney felt that Pepitone was secure, he left Pepitone with Officer Kesslan and presumably went to arrest Owens. When Pepitone appeared to bring himself into a position to further resist the officers by putting his arms underneath himself and beginning to crawl towards Owens, id. pp. 79-80, Swaney again used force to subdue him, this time by kicking him in the ribs. Although kicking Pepitone strikes the Court as severe, it is not

beyond the scope of reason when an officer is faced with a suspect who is resisting arrest. See Saucier, 533 U.S. at 205 (noting the Court should not view the circumstances with "20/20 vision of hindsight") (quoting Graham, 490 U.S. at 393); see also Feldman v. Community College of Alleghany, 85 Fed. Appx. 821 (3d Cir. 2003); Goodman v. Town of Golden Beach, 988 F. Supp. 1450, 1456-57 (S.D. Fla. 1997); Johnson v. District of Columbia, 445 F. Supp. 2d 1 (D.D.C. 2006) (noting repeated strikes to a suspect's body were reasonable under the circumstances). Once Pepitone was handcuffed, neither Swaney nor the other officer, used any additional force. See Ferraro, 284 F.3d at 1191, 1198-99 (finding excessive force where the plaintiff was already handcuffed when an officer slammed her head on the car); Priester v. City of Riviera Beach, 208 F.3d 919, 927 (11th Cir. 2000) (concluding that the force was excessive where a police officer released an attack dog on the plaintiff while the plaintiff was lying on the ground and the police officer's gun was pointed at the plaintiff's head). That Pepitone was being taunted by the officers and threatened with a police dog also strikes the Court as severe; however, this was done before he was handcuffed and it does not rise to the level of being actionable conduct under the Fourth Amendment.

B.

While Owens is a young mother, and the image of her being thrown against an automobile and later dragged by her blouse out of

her home in front of her young child is disturbing, Swaney's use of force falls well within what courts universally consider <u>de minimis</u> force.  <u>See, e.g.</u>, <u>Durruthy</u>, 351 F.3d at 1094.  Therefore, it is not actionable.  Woods's allegations do not suggest that any force other than the normal handcuffing procedure was employed on his person.  Thus, there is no violation of his rights under the Fourth Amendment.  <u>See</u> <u>Post</u>, 121 F.3d at 1460.  In the alternative, the Court finds that the amount of force used on both Owens and Woods, would not be so severe as to prevent Swaney's actions from being covered protected by qualified immunity.  <u>See Durruthy</u>, 351 F.3d at 1094.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendant Paul Swaney's Motion For Summary Judgment (DE 37) and Defendant City of Plantation's Motion For Summary Judgment (DE 39) be and the same are hereby **GRANTED;**

2. The Court shall enter Final Judgment by separate Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this ___19th___ day of March, 2008.

_____
WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

All Counsel and Parties of Record

25